[Cite as *Phelps v. Saffian*, 2016-Ohio-5514.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

### JOURNAL ENTRY AND OPINION
### No. 103549

**CHRISTINE PHELPS**

PLAINTIFF-APPELLEE/
CROSS-APPELLANT

vs.

**MICHAEL SAFFIAN**

DEFENDANT-APPELLANT/
CROSS-APPELLEE

**JUDGMENT:**
AFFIRMED IN PART, REVERSED IN PART AND REMANDED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Domestic Relations Division
Case No. DR-08-322365

**BEFORE:** Stewart, J., E.A. Gallagher, P.J., and Kilbane, J.

**RELEASED AND JOURNALIZED:** August 25, 2016

**ATTORNEYS FOR APPELLANT/CROSS-APPELLEE**

Joyce E. Barrett
James P. Reddy
Law Offices of Joyce E. Barrett
55 Public Square, Suite 1260
Cleveland, OH 44113


**ATTORNEYS FOR APPELLEE/CROSS-APPELLANT**

Carolyn C. Soeder
Joseph G. Stafford
Stafford & Stafford Co., L.P.A.
55 Erieview Plaza, 5th Floor
Cleveland, OH 44114

MELODY J. STEWART, J.:

{¶1} Plaintiff-mother Christine Phelps and defendant-father Michael Saffian asked the domestic relations division to modify Saffian's $1,571 per month child support obligation for the parties' 11-year-old daughter: Phelps wanted an increase in child support; Saffian wanted a decrease in child support. A magistrate conducted a trial and ordered that child support be modified, ordering retroactive, incremental increases raising Saffian's obligation to $4,350 per month. The court adopted the magistrate's findings without substantive change.

{¶2} Both parties appeal. The primary issues concern the amount of child support and attorney fees ordered: Saffian complains those amounts are too high; Phelps complains they are too low. Saffian also complains that the court erred by making the modification of spousal support retroactive to February 2009, that it took too long to issue a decision on the motion to modify child support, and that the court erred by failing to award him the child dependency exemption for tax purposes. Phelps complains that the court abused its discretion by failing to order Saffian to reimburse her for the child's school transportation expenses and by refusing to award her the full amount of her request for attorney fees.

{¶3} We conclude that the court erred by failing to consider whether it should impute potential income to Phelps, who worked only 20 hours per week. The court also erred by holding Saffian responsible for the child's private school tuition without considering that Phelps made the unilateral decision to send the child to private school and did so in violation of a restraining order prohibiting her from doing so. Finally, we find that the court erred by ordering the modification of child support to be retroactive to the date on which Phelps filed the motion to modify child support. We affirm the court's refusal to order Saffian to pay Phelps's costs incurred in transporting the child to school. The remaining assignments of error and

cross-assignments of error relating to the modified amount of child support ordered and the payment of attorney fees are mooted given that the court will need to recalculate child support on remand.

## I. Child Support

{¶4} Saffian's first assignment of error and Phelps's first cross-assignment of error relate to the court's order increasing Saffian's child support obligation.

{¶5} The common law duty requiring a parent to support a child is now set forth by statute. *See* R.C. 3109.05; *Meyer v. Meyer*, 17 Ohio St.3d 222, 224, 478 N.E.2d 806 (1985) ("The duty of divorced parents to support the minor children of their marriage is governed by * * * R.C. 3109.05[.]").

{¶6} The "needs" of a child must be viewed in light of first principles of child support: that "[t]he biological or adoptive parent of a minor child must support the parent's minor children out of the parent's property or by the parent's labor." R.C. 3103.03(A). The duty of support is one that provides the child with "necessaries" like food, clothing, shelter, medical care, and education. *Basista v. Basista*, 8th Dist. Cuyahoga No. 83532, 2004-Ohio-4078, ¶ 16.

{¶7} Consistent with this duty of support, Ohio has adopted what is known as the "income shares" model for child support — a model that presumes that a child should receive the same proportion of parental income as he or she would have received if the parents lived together. The income shares approach is based on expected child rearing costs and is allocated based on an "amount equivalent to the proportion of the obligor's share of the parents' aggregate incomes." J. David Sanders, Comment, *Shared Responsibility: Time for Illinois to Adopt the Income Shares Model of Child Support*, 38 S.Ill.U.L.J. 281, 287 (2014), citing Williams, Robert G., *Guidelines for Setting Levels of Child Support Orders*, 21 Fam.L.Q. 281, 293 (1987).

{¶8} The income shares approach is codified in R.C. 3119.02. That section states that a court shall issue a child support order by calculating the obligor's child support obligation in accordance with the child support schedule set forth in R.C. 3119.021. That schedule applies to parents with a combined income of up to $150,000.

{¶9} If the parents have a combined income exceeding $150,000, the child support guidelines do not apply. Instead, R.C. 3119.04(B) states that if the combined income of the parties exceeds $150,000, the court must establish the amount of child support on a case-by-case basis, taking into consideration the "the needs and the standard of living of the children who are the subject of the child support order and of the parents." For purposes of R.C. 3119.04(B), the "needs" of a child are the same as they were at common law: food, clothing, shelter, medical care, and education.

{¶10} The "lifestyle" of a child goes beyond mere need. It indicates the level of comfort that the child would have enjoyed beyond basic necessaries had the parents remained living together. *Wells v. Wells*, 9th Dist. Summit No. 27097, 2014-Ohio-5646, ¶ 14. Some courts have described this as addressing the "qualitative" needs of the child. *Abbey v. Peavy*, 8th Dist. Cuyahoga No. 100893, 2014-Ohio-3921, ¶ 24, citing *Zeitler v. Zeitler*, 9th Dist. Summit No. 04CA008444, 2004-Ohio-5551 at ¶ 8. A qualitative analysis focuses on observation and descriptions of a child's lifestyle. Although the word "qualitative" does not necessarily provide for precise determinations, its use recognizes that circumstances between children can vary based on their parents' income, and that the court has discretion to fashion a support order accordingly and on a case-by-case basis.

{¶11} Although the usual rule is that the courts prefer the finality of judgments, child support cases are an exception to the rule of finality: R.C. 3119.71 gives the court continuing

jurisdiction to modify a child support order. However, modification of a child support order can occur only if there has been a "substantial" change in circumstances from the original support order. *See* R.C. 3119.79(C).

{¶12} R.C. 3119.79(A) permits either the obligor or the obligee under a child support order to request a modification of the amount of child support due to a "substantial" change of circumstances. When an existing child support order has been entered using the R.C. 3119.02 mandatory child support guidelines, the court is required to recalculate the amount of child support owing under the guidelines. If the recalculated amount of child support exceeds the existing order by ten percent or is ten percent less then the existing order, the court shall consider the ten percent difference as a substantial change in circumstances warranting modification. *See* R.C. 3119.79(A).

{¶13} When the parties to a child support order collectively earn more than $150,000, what constitutes a substantial change of circumstances from the original support order is unclear. R.C. 3119.04(B) is silent on the matter.

{¶14} Some courts have applied the ten percent deviation test of R.C. 3119.79 to determine whether there has been a substantial change of circumstances warranting the modification of a child support order entered under R.C. 3119.04(B). *See, e.g., Reik v. Bowden*, 172 Ohio App.3d 12, 2007-Ohio-2533, 872 N.E.2d 1253, ¶ 18 (1st Dist.). But we question the application of the ten percent deviation rule to a request for modification of child support when the court did not use the child support guidelines to establish child support in the first instance.

{¶15} In *Siebert v. Tavarez,* 8th Dist. Cuyahoga No. 88310, 2007-Ohio-2643, we held that the child support guidelines are "expressly inapplicable in cases where the combined income of the parties exceeds $ 150,000[,]" apart from setting a floor beneath which support ordered

under R.C. 3119.04(B) cannot fall. *Id*. at ¶ 31. We reached this conclusion for two reasons. First, the plain language of R.C. 3119.04(B) makes it clear that the child support guidelines do not apply — the court is directed to determine the amount of child support on a case-by-case basis without "any factors to guide the court's determination in setting the amount of child support[.]" *Id*. Second, we concluded that the court could not fulfill its duty to make a case-by-case determination of child support if it "by rote extrapolates a percentage of income to determine child support." *Id*. at ¶ 34. If rote application of the child support guidelines does not fulfill the court's obligation to make a case-by-case determination of child support under R.C. 3119.04(B), application of the ten percent rule, without more, would likewise not constitute a case-by-case determination for purposes of modifying child support.

{¶16} In addition, it is unlikely that the General Assembly enacted a child support statute specifically for high-income parents, yet intended to permit modification of child support consistent with a statute designed for parents whose combined income is less than $150,000. By enacting R.C. 3119.04(B), the General Assembly understood that as the combined income of the parents increases, there comes a point under the guidelines where the amount of child support might far outstrip the needs of any child. We made this point in *Siebert*, noting that for very high income parents, the amount of child support under the guidelines could reach levels that could be viewed as "excessive." *Id*. at ¶ 35. For this reason, incremental changes in income for very high income parents are not, standing alone, substantial changes in circumstances because they do not affect a child's needs or lifestyle.

{¶17} Even though R.C. 3119.04(B) is silent on the issue of what constitutes a substantial change of circumstances sufficient to justify modification of child support, there are several considerations that guide the courts.

**{¶18}** First, consistent with R.C. 3119.04(B) from which an original child support order would issue, the court must consider the needs and the standard of living of the child and the parents. With the exception of extraordinary individual medical or developmental issues, as previously noted, the "needs" of a child are necessaries like food, clothing, shelter, medical care, and education. Needs are not income based — they apply in similar fashion for all children, regardless of the income level of the parents. That a parent has a large income has no effect on a child's basic needs: a child needs to eat, but a child does not need to eat caviar.

**{¶19}** Consideration of the "standard of living" the child would have enjoyed is based on the premise that parents may freely decide to dissolve their relationship, but children have no choice in the matter. If the child enjoyed a high standard of living during the marriage, the child is entitled to enjoy that standard after the marriage has been dissolved. *Boone v. Holmes*, 10th Dist. Franklin No. 14AP-449, 2015-Ohio-2242, ¶ 16. The court must be careful, however, to consider only how the child *would* have lived had the parents remained together, not how the child *could* have lived. When considering the standard of living of the parents, the court must ensure that the obligor parent is not so overburdened by support obligations that it affects that parent's ability to survive. *Id*. at ¶ 36. The court must also consider intangible contributions by the noncustodial parent to the effect those contributions may adversely affect that parent's standard of living. *Id*.

**{¶20}** Second, the court should be careful to give meaning to the word "substantial" as applied to what constitutes a change in circumstances warranting modification of child support. The word "substantial" means "drastic," "material," or "significant[.]" *Mandelbaum v. Mandelbaum*, 121 Ohio St.3d 433, 2009-Ohio-1222, 905 N.E.2d 172, ¶ 32*; Wuscher v. Wuscher*, 9th Dist. Summit No. 27697, 2015-Ohio-5377, ¶ 16. The requirement that a change in

circumstances be "substantial" is intended to prevent endless motions for modification based on incremental changes in income.

{¶21} Third, the change in circumstances must be one that the parties did not contemplate at the time the court issued the original child support order. *See* R.C. 3119.79(C) (allowing modification if the court determines that the amount of child support required to be paid under the child support order should be changed "due to a substantial change of circumstances that was not contemplated at the time of the issuance of the original child support order or the last modification of the child support order").

{¶22} In *Abbey,* 8th Dist. Cuyahoga No. 100893, 2014-Ohio-3921, ¶ 27, the panel suggested that a magistrate's decision that a party seeking modification of child support failed to establish "a substantial change of circumstances that was not contemplated at the time of the agreement" would be error because the modification provisions of R.C. 3119.79(C) do not apply to child support determinations made under R.C. 3119.04(B). But R.C. 3119.04(B) applies only to setting original child support obligations — the statute says nothing about modification of child support orders issued under that division. We believe that modification of child support orders entered under R.C. 3119.04(B) is governed by the general terms of R.C. 3119.79. And while all divisions of R.C. 3119.79 reference the child support guidelines, R.C. 3119.79(C) makes it clear that the court's obligation to modify child support consistent with the guidelines does not apply if the amount calculated pursuant to the child support guidelines would be "inappropriate." Because the child support guidelines do not apply to child support awards set under R.C. 3119.04(B), it would be "inappropriate" for the court to issue a new support order by utilizing the child support guidelines — a conclusion that *Abbey* specifically recognized. *Id.* at ¶

21 (quoting *Siebert* for the proposition that "the child support guidelines 'are expressly inapplicable in cases where the combined income of the parties exceeds $150,000.'")

{¶23} Fourth, the court should be careful to separate child support from spousal support. We have cautioned the trial court to avoid entering child support orders that operate as "de facto spousal support[.]" *Siebert,* 8th Dist. Cuyahoga No. 88310, 2007-Ohio-2643 at ¶ 36. While an obligee parent's standard of living is a consideration under R.C. 3119.04(B), the court must not modify child support solely to offer the obligee parent a better standard of living. To properly differentiate child support from spousal support, the court must consider how the obligee parent's standard of living has suffered in providing necessaries for the child. A decreased standard of living caused by an obligee parent's unnecessary expenditures for the child is not a valid basis for modifying child support, unless those expenditures would have been part of the lifestyle that the child would have enjoyed had the parents remained married.

{¶24} Phelps and Saffian were married in October 2002. Their child was born in July 2004. They were living in California when divorce proceedings were commenced. In January 2008, the California court issued an order establishing Phelps as custodial parent. Noting that the child had "primarily been in the care of her mother" since birth, the court approved Phelps's request to relocate to Cuyahoga County. The January 2008 custody order did not establish child support.

{¶25} Phelps and the child moved to Cuyahoga County in March 2008. Saffian, deciding to live near the child, likewise moved to Cuyahoga County. Those moves were completed by the time the California court issued the divorce decree in November 2008. In that decree, the California court established child support in the amount of $1,571 per month. The California court also found that "[t]he parties stipulated to the termination of spousal support[.]"

**{¶26}** In February 2009, Phelps filed a petition to register the California support decree and sought modification of child support; Saffian filed his own motion to modify child support in August 2009. The court granted the motion to register the foreign decree and combined the motions to modify child support for hearing.

**{¶27}** A magistrate presided over a trial on the issues and issued findings of fact and conclusions of law. The magistrate found that Phelps is a physician's assistant for a surgical unit at a hospital. She works, on average, 20 hours per week (two days per week and an additional day every other week). The magistrate's findings of fact conflicted on the reason why Phelps worked part-time: Phelps claimed that she desired to work more hours but none were available from her employer (magistrate's decision at 10); however, Phelps also testified that the reason she does not work full time is because she would need daycare for the child (magistrate's decision at 7). The magistrate found that Phelps had unsuccessfully requested more hours from her employer, but conceded that she did not inquire into moving to a different department after being told that there were no more hours available to her in her current position.

**{¶28}** The magistrate determined Phelps's earnings as follows:

2009: $42,606.05
2010: $43,844.01
2011: $46,872.78
2012: $50,425.09
2013: $53,816.80

**{¶29}** Determining Saffian's income was significantly more problematic. Saffian is a medical doctor and partner in an anesthesiology practice group. In addition to the salary and dividend income that he earned from his medical partnership, Saffian has various real estate investments from which he derives income. A summarized version of the magistrate's decision shows Saffian's earnings as follows:

2009: $368,676.98
2010: $489,951.38
2011: $475,217.30
2012: $543,970.97
2013: $544,791.04

**{¶30}** The magistrate's findings show that Phelps has two major expenses: private school tuition for the child and attorney fees incurred for this action.

**{¶31}** The magistrate found that Phelps made the decision, over Saffian's objection, to send the child, then five years old, to private school.   It is unclear when the child started school: the magistrate stated that Phelps testified that the child started attending the private school in the 2009-2010 school year; the mother also testified that she alone paid the child's school tuition, and had done so "since the 2011-2012 school year."  Those facts conflicted with an October 2010 temporary restraining order issued by the court, barring Phelps from removing the child from the public school.   In any event, even with financial aid, Phelps pays tuition of nearly $9,000 per year — an amount that the magistrate determined equated to 18 percent of her gross income.   In addition to tuition, Phelps claimed "travel expenses" of $4,108.40 to transport the child back and forth to school, and daycare expenses of $6,600 per year.   Saffian offered to assist Phelps with the child's school transportation, but Phelps refused the offer.

**{¶32}** Apart from finding that the child had been diagnosed with attention deficit hyperactive disorder in January 2014, the magistrate made no findings that the child had any special needs.   Saffian opposed the child's attending private school because he believed that she was doing well in her former school and he feared that changing schools would "destabilize" her.   The magistrate found that by the time of trial, Saffian had conceded that removing the child from private school and re-enrolling her in public school would not be in her best interests.

**{¶33}** The magistrate found that Phelps owes $30,000 to $40,000 in attorney fees related to her motion to modify child support. By Phelps's own estimation, the prolonged litigation has her "sinking and sinking financially."

**{¶34}** The magistrate made a number of findings regarding Phelps's living situation. She rents a house for $500 per month. As the trial was nearing its conclusion, Phelps's rental house was severely damaged by flooding caused by thunderstorms. Phelps said that insurance would not cover any of her losses. Her automobile was also damaged by the flooding. She said that her insurance claim on the automobile had been denied, but later admitted that her auto insurance company was investigating her claim and had provided her with a "loaner" vehicle.

**{¶35}** The magistrate found that Phelps was "frugal." Despite her frugality, she was forced to use her savings to pay her monthly bills. In addition to school tuition, Phelps pays for the child's extra-curricular activities like gymnastics and girl scouts. Phelps also pays the child's out-of-pocket medical expenses. Those medical expenses, for the years 2011 and 2012, averaged a little over $10 per month; in 2013, the medical expenses were $12.

**{¶36}** The magistrate made few findings regarding Saffian's standard of living apart from his having the ability to purchase a home and vehicle of his choosing and traveling on vacations. The magistrate rejected Saffian's assertion that he lived an "austere" lifestyle, noting that Saffian believed the child lived in a "good" home when staying with him, but that the child did not have to live in a home like his when staying with Phelps.

**{¶37}** The magistrate made the following findings with respect to the change in circumstances of the parties as justification for granting Phelps's motion to modify child support:

> After reviewing and considering the sworn testimony of the parties and the evidence presented, and after considering the nature, value and truthfulness of said evidence and testimony this Magistrate determines that a substantial change in

circumstances has occurred in considering the minor child, * * * qualitative needs and standard of living, in considering the Plaintiff's qualitative needs and standard of living and in considering the Defendant's qualitative needs and standard of living. The change in circumstances having occurred since Plaintiff moved to Ohio in March / 2008 and also since the filing of her original Motion to Modify Child Support (#275176) filed on February 5, 2009 as part of her Petition to Register the California Decree and her Motion to Modify Child Support (#278388, filed on April 2, 2009). The change of circumstances since the parties' divorce is evident not only economically in that there is a great and growing disparity of income between father and mother, but more importantly in the standard of living and lifestyle [the child] both previously and currently has in her primary household with mother as in comparison to father's lifestyle and standard of living.

Further, in this case the evidence showed that mother is solely paying [the child's] school tuition since [the child's] enrollment in [the private school] since the 2011-2012 school year. The school tuition payment comprises of [sic] about 18% of her gross income. Mother also has had to pay all of [the child's] associated school expenses. Further, mother alone has paid all of [the child's] out of pocket medical expenses, daycare expenses and extracurricular expenses. [The child's] needs and standard of living in her mother's home, wherein she lives a clear majority of the time is clearly sub-standard and deficient. The home is prone to flooding. [The child's] standard of living in mother's home dramatically pales in comparison to the standard of living she would have enjoyed had the parties remained married. Further, and importantly, [the child] has been diagnosed as having Attention Deficit Hyperactivity Disorder (ADHD). She will likely need additional supportive treatment in this regard.

{¶38} The magistrate carried out two different calculations under the child support guidelines: one calculation with extrapolation; the other calculation without extrapolation.

The magistrate issued a new support order, effective June 1, 2015, ordering Saffian to pay $4,350 per month in child support. The magistrate also modified Saffian's child support obligation with retroactive effect based on the following dates:

From February 5, 2009 through December 31, 2009, $3,249.57 per month;
From January 1, 2010 through December 31, 2010, $3,911.37 per month;
From January 1, 2011 through December 31, 2011, $3,990.67 per month;
From January 1, 2012 through December 31, 2012, $4,290.04 per month;
From January 1, 2013 forward, $4,350.00 per month.

**{¶39}** Calculating the retroactive amount of unpaid, modified child support, the magistrate found that Saffian owed a total of $191,558.74.

**{¶40}** Saffian's first assignment of error raises a number of arguments in opposition to the court's decision to modify child support, particularly with respect to the amount ordered.

**{¶41}** We first consider Saffian's argument that the court erred by adopting the magistrate's finding that Phelps earned $53,816.80. Saffian argues that Phelps was only working 20 hours per week, so the court should have imputed income to her based on full-time employment.

**{¶42}** For purposes of calculating child support obligations, R.C. 3119.01(C)(5)(b) defines "income" for a parent who is unemployed or underemployed as "the sum of the gross income of the parent and any potential income of the parent." "Potential" income is defined as "[i]mputed income that the court or agency determines the parent would have earned if fully employed[.]" R.C. 3119.01(C)(11)(a). Whether a parent is "voluntarily underemployed" is a matter to be determined by the trial court based upon the facts and circumstances of each case. *Rock v. Cabral*, 67 Ohio St.3d 108, 616 N.E.2d 218 (1993), syllabus.

**{¶43}** The magistrate issued conflicting findings about Phelps's employment. He found that she denied that her part time employment had been voluntary and that her work hours were "what is available from her employer." However, the magistrate found that Phelps "testified that the reason why she does not work full time is because she would need daycare" and that "her employment allows her to spend more quality time" with the child. In addition, the magistrate found that Phelps "testified that she has not asked to work more hours" and conceded that she did not inquire into transferring to other units where more work hours might be available to her.

{¶44} An abuse of discretion exists when a decision is unreasonable, arbitrary, or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E. 2d 1140 (1983). The magistrate acted unreasonably by making factual findings that were inherently contradictory with respect to why Phelps only worked part time hours. What is more, the magistrate gave no consideration to whether Phelps had the ability to work more hours and whether potential income should be imputed to her. While the court had broad discretion to fashion a child support order, it erred by upholding a magistrate's decision that failed to consider Phelps's potential income for purposes of establishing child support.

{¶45} Phelps's primary basis for seeking a modification of child support was that the expense of providing a private school education for her child caused a significant financial distress. Saffian complains that the court erred by finding that Phelps's unilateral decision to enroll the child in private school constituted a change of circumstances warranting modification of child support to assist her in paying for it.

{¶46} The magistrate found that Phelps "conceded that the decision for [the child] to attend [private school] was her own decision, without father's input." Saffian's objection to the child attending private school was not only known to the court, but was the subject of an October 15, 2010 temporary restraining order barring Phelps from removing the child from the public school she was attending. The court issued a second temporary restraining order on August 18, 2011, again restraining Phelps from removing the child from the public school she was attending. In an affidavit attached to a motion to vacate the temporary restraining order, Phelps admitted that the child began attending the private school beginning August 17, 2011. On September 6, 2011, Saffian filed a motion asking the court to have Phelps show cause as to why she should not be held in contempt for violating the temporary restraining order. That motion pended before

the court until July 2013, when the parties, in the course of resolving certain parenting issues, agreed that the child would continue to attend the private school.

**{¶47}** When modifying child support retroactive to the February 2009 date on which Phelps filed her motion to modify child support, the magistrate gave no consideration to Phelps's act of defying the temporary restraining order prohibiting her from enrolling the child in private school. Instead, the magistrate focused solely on how the child's private school tuition comprises 18 percent of Phelps's gross income and how she alone was bearing that expense. However, that expense was unilaterally and voluntarily entered into by Phelps, and in direct violation of the court's restraining order. The magistrate gave no attention to Phelps's act of violating the temporary restraining order and should have considered whether she alone should have borne the cost of the first two years of the child's private school tuition. To hold otherwise would be to allow Phelps to benefit from her clear disregard of the court's restraining order.

**{¶48}** Our resolution above necessarily moots any consideration of the parties' separate arguments relating to the modified amount of child support. Nevertheless, we wish to draw attention to certain aspects of the magistrate's decision that may have blurred the distinction between child support and spousal support.

**{¶49}** The findings of fact issued by the magistrate suggest that Saffian had a duty to offer financial support *to Phelps* beyond his stated obligation in the child support order.

**{¶50}** When the parties divorced, they stipulated to the termination of spousal support. Despite (or perhaps because of) that stipulation, there appears to be obfuscation of child support and spousal support by Phelps. In her brief on appeal, Phelps details how Saffian was ordered by the California court to pay $1,428 per month for spousal support, an order "which ultimately terminated without a corresponding increase in child support. [Husband] merely skated by on the

remaining $1,571 monthly child support which was ordered, paying no more than the bare minimum until the court finally modified the woefully inadequate child support order * * *." Appellee's brief at 2.

**{¶51}** The magistrate asserted that he had "differentiated between the need to ensure the custodial parent's standard of living from defacto spousal support," magistrate's decision at 56, but many of the magistrate's findings suggested that Saffian had an obligation to raise Phelps's standard of living. With no evidence to show that the child suffered as a result of these findings, the magistrate appeared to suggest that Saffian had a moral obligation to support Phelps beyond the terms of their divorce decree, a position consistent with Phelps's trial strategy. Saffian had no legal duty to support Phelps. On remand, the court must carefully distinguish the child's need for support from Phelps's personal needs when considering modification of child support.

**{¶52}** Nothing we have said here should be construed to suggest that modification of child support was unwarranted in this case. Saffian's increased income alone warranted modification so that the child could enjoy a lifestyle consistent with the one she would have enjoyed had the parents not divorced. The court has broad discretion to modify child support; however, that discretion must be exercised consistent with the law.

### II. Retroactive Effect of Child Support Modification

**{¶53}** Although our conclusions thus far moot other arguments relating to the amount of child support, Saffian's argument that the court erred by giving retroactive effect to the modified child support order remains viable for review. The magistrate ordered support modification retroactive to the date when Phelps filed her motion to modify child support. That order modified child support retroactive for six years to the date when Phelps filed her motion to modify child support.

**{¶54}** R.C. 3119.84 allows the court to "modify an obligor's duty to pay a support payment that becomes due after notice of a petition to modify the court support order has been given to each obligee and to the obligor before a final order concerning the petition for modification is entered." This section has been interpreted to "plainly state[ ] that a court may retroactively modify a child-support payment that became due after the obligee of the order had notice of the petition to modify the support order." *Byrd v. Knuckles*, 120 Ohio St.3d 428, 2008-Ohio-6318, 900 N.E.2d 164, ¶ 4. As with other child support issues, we review the court's decision to order retroactive modification of child support for an abuse of discretion. *Davis v. Dawson*, 8th Dist. Cuyahoga No. 87670, 2006-Ohio-4260, ¶ 7.

**{¶55}** It took six years for a decision on the motions to modify child support. The magistrate acknowledged that a question over the court's jurisdiction to rule on an unrelated motion for the allocation of parental rights and responsibilities left the parties in "judicial limbo" for two years.[1] Even after the jurisdictional issue had been resolved, matters did not proceed apace. Although there were only six days of trial, they were held between November 27, 2013 and May 20, 2014. The magistrate mentioned the delay only by noting that there were "time constraints." The parties were given nearly three months to file closing arguments. It took an additional ten months to issue a decision.

**{¶56}** We have encountered cases involving even longer delays in the issuance of magistrate's decisions from the domestic relations division. *See, e.g., Brown v. Brown*,

---

[1] In *Pula v. Pula-Branch*, 8th Dist. Cuyahoga No. 93460, 2010-Ohio-912, this court held that the domestic relations division did not have jurisdiction to hear an interstate petition for child support because it was not a "domestic relations matter" for purposes of R.C. 2301.03(L)(1), which defines the jurisdiction of the domestic relations division and that a motion filed under the interstate act should be brought in the juvenile division. The Ohio Supreme Court reversed this court in *Pula v. Pula-Branch*, 129 Ohio St.3d 196, 2011-Ohio-2896, 951 N.E.2d 72, holding that the domestic relations division has jurisdiction over an action for support brought under the Uniform Interstate Family Support Act "even if the action does not arise from a divorce, dissolution of marriage, legal separation, or annulment." *Id*. at ¶ 10.

2014-Ohio-2402, 14 N.E.3d 404, ¶ 4 (8th Dist.) (Sixteen month delay); *Chiro v. Foley*, 8th Dist. Cuyahoga No. 99888, 2013-Ohio-4808 (describing 16-month delay as "troubling"); *Hall v. Hall*, 8th Dist. Cuyahoga No. 77804, 2001 Ohio App. LEXIS 1167 (Mar. 15, 2001) (questioning the "reasonableness" of a 19-month delay). In those cases we found no error that would require reversal nor do we find any error in that respect in this case. We do, however, find that the magistrate acted unreasonably by deciding that a "possible inequity" might result if he did not modify child support retroactively.

{¶57} Saffian was not responsible for putting the case into a "judicial limbo," nor was he solely responsible for stretching six days of trial over five months. And there is no dispute that neither party had any control over the length of time it took for a decision to render. Those delays, amounting to well over three years, must be attributed to the court. It was inequitable for the court to order modification of child support retroactive to the date on which Phelps filed her motion to modify because the length of the delay allowed the court to order modification of child support based on Saffian's income in the most current years and not on his income at the time the motion was filed.

{¶58} The delay also enabled the magistrate to modify child support based on expenses that Phelps incurred well after the motion to modify had been filed. For example, the magistrate made findings that the modification of child support was necessary because Phelps suffered significant expenses after her rental home was flooded, causing her the loss of certain appliances and damage to her vehicle. The flooding occurred in May 2014, a week before the last day of trial. Although the flooding would have been a viable factor to consider as part of Phelps's "needs and standard of living," it would not have been a viable factor to consider for purposes of modifying child support retroactively to February 2009. The magistrate did not clearly indicate

that he did not take those expenses into account when ordering retroactive modification of child support.

**{¶59}** We also question how the magistrate could have determined that it would be equitable to retroactively modify a California child support order that had been in place for only a few months. Phelps argues that the California support order "was a mere $1,571.00 per month," Appellee's brief at 1, but when she appealed from aspects of that child support order, she did not challenge the amount of the child support at that time. *See Phelps v. Saffian*, Cal. App. No. A116570, 2007 Cal. App. Unpub. LEXIS 9685 (Nov. 30, 2007). Although decided in 2007, that appeal was interlocutory and the case did not become final until November 2008 when the California court issued the divorce decree. That decree again stated Saffian's child support obligation as $1,571 per month. To our knowledge, Phelps did not appeal from the final California divorce decree to raise any issue regarding the amount of child support; instead, she registered that decree in Ohio in February 2009 and in April 2009 sought modification of the decree. The magistrate ordered modification of child support retroactive to February 2009 on the mistaken belief that Phelps had first sought modification of the order at that time. The February 2009 filing by Phelps was a petition to register the divorce decree for "enforcement and modification of the terms of that decree governing support." In fact, the February 2009 petition did not seek modification of child support — it merely asked the court to register a foreign decree so that a future motion to modify child support might be offered. Notably, the February 2009 petition to register the decree did not contain an affidavit in support of a request for modification of child support as required by Loc.R. 19(B) of the Cuyahoga County Court of Common Pleas, Domestic Relations Division — (but the April 2009 motion did). So not only did the magistrate lack a basis for finding that a substantial change in circumstances existed from

a support order entered just a few months before Phelps filed her motion to modify child support, the court erred by ordering the retroactive modification of child support to a point in time that predated the actual motion to modify.

{¶60} We are aware that the magistrate believed that Saffian "seemingly concedes" that child support should have been modified retroactively given his closing argument on his own motion to modify child support on a yearly basis beginning in 2009. We reject this assertion because Saffian's request that his motion to modify child support be granted retroactive to 2009 is not the same as "conceding" that Phelps's motion to modify child support should likewise be given retroactive effect. Saffian's closing argument made it clear that he was referring only to his motion to modify child support, not Phelps's motion to modify child support.

### III. Child Support Exemption

{¶61} Saffian next argues that the court erred by failing to award him the child dependency exemption for federal income tax purposes.

{¶62} R.C. 3119.82 requires the court to designate which parent may claim the federal income tax child dependency exemption. This has been held to be a mandatory duty. *See Horvath v. Horvath*, 5th Dist. Stark No. 2004-CA-00160, 2004-Ohio-6764, ¶ 7. The court did not fulfill this duty — there is nothing in the magistrate's decision assigning the exemption to either party. We sustain this assignment of error. On remand, the court must assign the exemption consistent with R.C. 3119.82.

### IV. Attorney Fees

{¶63} Both Saffian and Phelps complain about the amount of attorney fees awarded: Saffian claims they are too high; Phelps claims they are too low. Given the remand necessary for a recalculation of child support and any retroactive application, the court may modify the

amount of attorney fees accordingly. We therefore decline to address the substance of these assigned errors.

## V. Transportation Expenses

**{¶64}** In the sole remaining cross-assignment of error, Phelps complains that the court erred by failing to order Saffian to reimburse her $4,108.40 as costs for transporting their child to school.

**{¶65}** The magistrate found that Phelps made the unilateral decision to send the child to private school, even ignoring the terms of a temporary restraining order that prohibited her from removing the child from her public school. Phelps does not contest that finding, but claims that Saffian eventually agreed that it was in the child's best interests to attend the private school. That argument misrepresents the facts: Saffian only agreed to withdraw his objection to the private school after two years had elapsed without a ruling by the court on his motion to have Phelps show cause why she should not be held in contempt for violating the temporary restraining order. By that point, the child was established in the new school, and Saffian apparently concluded that another move would have been counterproductive.

**{¶66}** Throughout these proceedings Phelps complained that Saffian did not "voluntarily" offer to pay amounts that he was not legally obligated to pay. In fact, at numerous points in his decision, the magistrate appeared to agree with Phelps.[2] We wish to be clear that Saffian had no legal obligation to contribute voluntarily to support the child. Nevertheless, the magistrate

---

[2] For example, the magistrate found that Phelps enrolled the child in an expensive private school over Saffian's objection and that Saffian "had not paid any money toward the tuition." The magistrate found that Phelps drives a "used" vehicle and that Saffian has not assisted Phelps in "getting a better car." The magistrate found that the child is placed in child care when Phelps works second shift, but "father has refused to assist her in paying the babysitter." The magistrate found that Phelps did not work full-time because she would need daycare, but "cannot afford it and Saffian has not offered to help."

found that Saffian did offer to transport the child to and from school — an offer that Phelps rejected. Given that Phelps made the unilateral decision to enroll the child in private school in violation of a court order prohibiting her from doing so, and that she rejected Saffian's offer to transport the child, the court did not err by adopting the magistrate's decision to deny Phelps's claim for transportation expenses.

## VI. Delay

**{¶67}** Saffian raises several arguments concerning the delay in bringing this case to a conclusion. As earlier indicated, those delays are not reversible error, nor could they be because they do not involve an error of law.

**{¶68}** Nevertheless, we agree that the delays in this case have been untenable. We therefore order the court to issue a new ruling on the motions to modify child support consistent with this opinion within 60 days of the date this decision is journalized.

**{¶69}** Judgment affirmed in part, reversed in part and remanded.

It is ordered that appellant/cross-appellee recover of appellee/cross-appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the domestic relations division to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MELODY J. STEWART, JUDGE

EILEEN A. GALLAGHER, P.J., and
MARY EILEEN KILBANE, J., CONCUR